GRAND TURK. The (McGINNIS v.). See Case No. 8,800.

---

## Case No. 5,684.

### In re GRANGER et al.

[8 N. B. R. 30.][1]

District Court, E. D. Michigan. 1873.

BANKRUPTCY—UNSECURED DEBT—DISCHARGE OF ENDORSER.

A petition was made by the assignee to the bankruptcy court praying that the claim of a bank be expunged and that certain securities in

---

[2] [1 Doug. 101.]

[1] [Reprinted by permission.]

its possession should be delivered up to him. The claim consisted of three notes, upon two of which the bankrupt was endorser; the third note had been extended by agreement between the maker and the bank. *Held,* that the first two notes were valid against the bankrupt's estate, but that his (bankrupt's) liability had been relieved in the third note by the agreement to extend the note, and was, therefore, not a valid claim, and must be expunged from the proof of debt, and that as the claim of the bank had been proved as an unsecured debt it must relinquish the securities held by it to the assignee. Ordered that the bank pay to the assignee the cost of this proceeding, including a solicitor's fee of twenty-five dollars, and authorizing the assignee to retain it out of any dividend going to the bank.

[In bankruptcy. In the matter of Granger and Sabin.]

This matter came to be heard and was argued and submitted upon the petition of John J. Speed, assignee, to expunge the claim of the Merchants' Bank of Canada, and to compel the delivery to the assignee of certain securities alleged to be held by the bank, and upon the answer of the bank and the proofs taken.

Mr. Speed, in person, Mr. Meddaugh (Meddaugh & Driggs), and Mr. Lothrop, for petitioner.

Mr. Douglass, opposed.

LONGYEAR, District Judge. The claim of the bank as proven is founded upon the endorsements by the bankrupts of three promissory notes, two for five thousand dollars each, made by Granger, Carter & Co., and one for two thousand dollars, made by one A. N. Sabin.

First. As to the two notes for five thousand dollars each. The objections to these notes, as stated in the petition, are: 1. That the notes were discounted by the bank for the benefit of the bankrupts and not of the makers, and that the makers received no consideration therefor. 2. That the notes, being payable in "gold or Canada currency," are not negotiable, and that therefore the bankrupts could not be charged as endorsers thereon. The first objection is clearly not well taken, and it was not insisted on upon the argument. As to the second objection, it clearly appearing from the proofs as well as from the allegations in the petition that these notes were negotiated to the bank by the bankrupts for a loan made to them and for their sole benefit, and that therefore they are liable to the bank for the amounts specified in the notes, whether they are liable as endorsers or not, and no objection being made to the amount of claim as proven, it was decided by the court, at the hearing, that the claim of the bank as proved, so far as it is based upon these two notes, should not be disturbed. The prayer of the petition to expunge as to the two notes for five thousand dollars each is therefore denied.

Second. As to the note for two thousand dollars: The only objection to this note insisted on the hearing is that the liability of the bankrupts, as indorsers had become dis-

charged in consequence of a valid agreement between the bank and A. N. Sabin, the maker, for an extension of time for a definite period; and it is as to this point that the matter was held under the advisement by the court. The proof shows that the bankrupts were mere accommodation endorsers, and that the note was discounted by the bank for the sole benefit of the maker.

It is well settled, in fact, it was conceded on the argument, and needs no argument or citation of authorities to prove it, that a valid agreement for extension of time between a creditor and the principal debtor without reservation discharges the surety or indorser. It also seems to be well settled, and it was not seriously disputed on the argument, that if when such agreement for extension is entered into it is also expressly agreed between the creditor and the principal debtor that the former may and does reserve his rights and remedies against the surety or endorser, then the latter are not discharged. 1 Pars. Notes & B. 239, 241, and cases there cited. This is, no doubt, on the ground, and it is so stated in some of the authorities, that by such agreement the principal debtor remains liable to reimburse his surety at once, upon the payment of the debt by the latter, notwithstanding as between him and the creditor the time has been extended. The proof shows that when this note matured and after protest, the bank took a new note of A. N. Sabin, the maker, on three months' time, for the same amount, as a renewal of the note in question; and that Sabin paid the interest for the three months upon which the new note was given, in advance. Payment of interest in advance is sufficient consideration for an agreement for extension of time; and, under the rule of law above stated, and it is so conceded, the transaction clearly discharged the bankrupts from their liability as endorsers, and it must be so held, unless what is further shown relieves the transaction from that effect. It is contended, however, on the part of the bank, that at the time of taking the new note there was an understanding and agreement between the bank and A. N. Sabin, that the rights and remedies of the bank against the bankrupts, as endorsers on the old note, should remain and that the old note was retained by the bank uncanceled in pursuance of that agreement; and that, therefore, under the other rule of law above stated, the liability of the bankrupts as indorsers was not discharged. I will, therefore, now proceed to consider that question of fact as developed by the proofs. Before doing so, however, it is proper to remark that the bank in its answer sets up no such agreement. It simply contents itself with a broad, general denial of any extension of time whatever. If this point had been made, at the hearing, it would have been the duty of the court to have excluded all proofs outside of that one question; but as it was not made, and the matter was argued and submitted as if

the answer were broad enough to cover the claim set up, I shall so consider it in my decision.

The question is, then, do the proofs sustain the claim that there was an understanding and agreement as stated? A valid extension of time to the principal debtor having been shown, the burden was upon the creditor bank to prove the agreement alleged. The agreement to have the effect claimed must have been express, and made at the time of the extension, and as a part of the transaction. The court will not, in such a case, act upon any implications arising from the manner in which the business was transacted between the creditor and principal debtor, any further than as such implications bear upon and tend to corroborate other testimony tending to prove an express agreement, especially where, as in this case, there is no proof or pretense of an assent by the endorsers to remain liable as such, notwithstanding the extension. The proofs upon this point are confused, vague and uncertain, as the following statement clearly shows. Clement D. Grasette, who was agent of the bank, and with whom the business of taking the new note was transacted, was the only witness examined as to this point. After having been examined, before the register, he was called and re-examined, during the argument, before the court. In his testimony, on the first examination, he gives as a reason why the new note was taken, that the bank desired to continue to discount to A. N. Sabin, but could not do so while he was in default upon his paper, and the new note was taken to avoid that difficulty. He speaks of it as a renewal of the note in question in every instance, except once, when asked the direct question, he said it was taken as "collateral;" and he speaks of the note in question as having been "taken up" by the new note. He nowhere speaks of the new note as a mere extension of time upon the old note. He says, however, that the old note was retained by the bank for the purpose of "ranking on the estate" (to use his own language) of the bankrupts as endorsers; but on that examination he is entirely silent as to any express understanding or agreement on the part of A. N. Sabin, the maker, or any agreement whatever under or by virtue of which the old note was so retained. Thus far, then, the release of the bankrupts as endorsers, by the taking of the new note, was not rebutted.

The above testimony having been read at the hearing, counsel for the bank asked the privilege of recalling the witness Grasette for further examination, and as a foundation for the request, on the suggestion of the court, stated to the court in writing what he expected to prove, as follows: "We expect to prove by Mr. Grasette, that at the time of taking the new note of A. N. Sabin, for the amount of the old note endorsed by Granger & Sabin, it was understood and agreed between the bank and A. N. Sabin that the remedy of the bank against the endorsers of the old note, or their estate in bankruptcy, should be reserved, and also that the new note should be held collateral to the old." This appearing to be pertinent, the request was granted. The hearing was thereupon suspended, and Grasette was recalled and was further examined before a commissioner. On his re-examination, having repeated his statement that the bank retained the old note, Grasette was asked: "Was it the understanding between you and Mr. Sabin that the bank should retain it?" to which he answered: "It must have been so." This answer amounts to nothing whatever. It states no fact. It is argumentative merely—a mere opinion or conclusion of the witness. It is true, on a direct and leading question being propounded to him by the counsel for the bank, whether it was or was not the understanding between him and A. N. Sabin that the bank should retain or reserve all its rights against the bankrupts, as endorsers of the old note, he answered: "It was." But on his cross-examination he fails to recollect anything whatever that passed between him and A. N. Sabin upon that subject, but says: "I feel sure that it must have been to the effect that we retain possession of the old note in order to show that we had, under the advice of counsel, recourse against the endorsers, Granger & Sabin." Thus repeating, only with a little more amplification, his answer to the first direct question. It thus appears that the evidence as to whether there was such an agreement or not, rests solely upon the opinion of this witness, unaided by proof of a single fact other than the bare fact that the old note was retained by the bank. This is certainly not sufficient to save the liability of the endorsers, because, 1. It nowhere appears that the old note was so retained by the bank by A. N. Sabin's consent, or that it was left there by him by mere oversight or mistake so far as he was concerned; and, 2. It would not be sufficient to enable the endorsers to recover against the maker if they had paid the note after the new note was taken. In this connection it is a significant fact that A. N. Sabin, who certainly could have cleared the matter up by either denying that there ever was such agreement, or by admitting it have fixed his liability to his endorser, was not produced and examined as a witness, nor was the omission to call him explained. The fact that Grasette, as agent for the bank, was acting under advice of counsel, and intended, as he testifies, to follow that advice, does not help the case at all under the circumstances, because; first, it does not appear that Grasette's intentions in this respect were made known to A. N. Sabin and agreed to by him; and, second, it does not appear that the advice under which he was acting was, in fact, followed by him.

The advice under which he was acting, as testified to by the learned counsellor from whom he obtained it, was, among other things, as follows: "I told him that he couldn't ·take new paper and extend the paper without discharging the endorsers, unless there was a distinct agreement with the endorsers that they should not be discharged. If any new paper was taken it should be with that understanding." There is no proof whatever that any such agreement· or understanding was had.

But there is one other fact developed by the testimony which, it seems to me, must, in any event, settle the question of the liability of the· bankrupts, as endorsers against the bank, beyond all dispute. Grasette testifies that the new note was discounted by the bank and the amount thereof placed to the credit of A. N. Sabin, the maker of the note in question, and of the new note. Now, if the new note was a renewal of the note in question, or was taken as collateral to it—and that it was the one or the other there is no dispute—then the credit. given on account of the new note was equally in lieu of the note in question, or collateral to it; and it is precisely the same in effect as if A. N. Sabin had deposited in the bank against the note in question the amount thereof in money. Assuming, then, for the sake of the argument, that there was, as claimed, an agreement between A. N. Sabin and the bank, that the rights and remedies of the latter against the bankrupts as endorsers should be reserved, the case assumes this shape: A. N. Sabin, the maker of the note in question, pays the amount thereof to the bank, to be placed to his credit, and the note to be retained by the bank to enable it to pursue the bankrupts' estate upon the endorsement. No such arrangement as that ever has been or ever· can be tolerated by any court for a moment. Any amount the bank might be able thus to realize out of the bankrupts' estate would be, as to it, a double payment of the debt, or it must go directly to the benefit of A. N. Sabin, the only person ultimately liable to pay the same, and thus, in either event, operate as a fraud upon the bankrupts' estate. The fact testified to by Grasette, that whatever amount should be realized from the estate was to be applied upon A. N. Sabin's new note, does not help the case of the bank at all, because the bankrupts are in no manner liable upon that note. On the contrary, that fact substantiates what was said above—that whatever might be ·thus realized from the estate would go· to the benefit of A. N. Sabin. I think the true view of the case is that the note in question was extinguished by the new note and the credit given on account of it. It results that the note for two thousand dollars must be expunged from the claim of the bank, as prayed in the petition, and the claim of the bank as proven must be abated accordingly.

10FED.CAS.—61

Third. As to the collaterals held by the bank. It is admitted by the answer that the bank has in its possession four hundred and fifty dollars in United States currency, and a promissory note of one H. R. Stone for one thousand dollars, belonging to the bankrupts' estate which the bank claims to hold as collateral security for the indebtedness of the bankrupts' estate to the bank. The claim of the bank is proven in these bankruptcy proceedings as an unsecured claim, no reference being made in such proofs to any security whatever. It is now, I believe, pretty well settled that a creditor so proving his claim must be held to have thereby relinquished any and all security which he may have held for the same debt. But a resort to that legal proposition is unnecessary in this case, because it clearly appears from the proofs that the money and the note so admitted to be held by the bank are not held as collateral to the debt proven, or to any other existing indebtedness of the estate to the bank. The said sum of four hundred and fifty dollars, and the said promissory note of H. R. Stone for one thousand dollars, must, therefore, be paid over and delivered up by the bank to the assignee.

An order must be made in this matter: Denying the prayer of the petition as to the two notes for five thousand dollars each. Expunging from the claim of the bank the note for two thousand dollars, and for a correction and abatement of the claim of the bank accordingly. Requiring the delivery by the bank to the assignee of the promissory note of H. R. Stone for one thousand dollars, and directing the assignee to withhold all dividends going to the bank until the same is done. Requiring the payment by the bank to the· assignee of the sum of four hundred and fifty dollars, and authorizing the assignee to retain that amount, if not paid, out of any dividends going to the bank. Requiring the payment by the bank to the assignee of the costs of this proceeding, including a solicitor's fee of twenty-five dollars, to be taxed, and authorizing the assignee to retain the same out of any dividends going to the bank. That the order be certified to the register, Hovey K. Clarke, Esq.